UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

CLARENCE STOKES,

                Petitioner,

        vs.

SUPERINTENDENT GRAHAM, Auburn
Correctional Facility,

              Respondent.

No. 9:06-cv-01026-JKS

MEMORANDUM DECISION

Petitioner Clarence Stokes, a state prisoner appearing *pro se*, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Stokes is currently in the custody of the New York Department of Correctional Services, incarcerated in the Auburn Correctional Facility. Respondent has answered the petition.  Although the time for doing so has long lapsed, Stokes has not filed a traverse.

## I.  BACKGROUND/PRIOR PROCEEDINGS

In February 2003 Stokes was convicted following a jury trial in the Onondaga County Court of First-degree Manslaughter [N.Y. Pen. Law § 125.20(1)].  Stokes was sentenced to a determinate term of 20 years, followed by 5 years of supervised release.  Stokes, represented by counsel, timely appealed his conviction to the Appellate Division, Fourth Department, which affirmed his conviction and the New York Court of Appeals summarily denied leave to appeal on July 26, 2005.  *People v. Stokes*, 796 N.Y.S.2d 832 (N.Y. App. Div.), *lv. denied*, 835 N.E.2d 676 (N.Y. 2005).

While his appeal was pending, Stokes, appearing *pro se*, filed a motion in the Onondaga County Court  to vacate the judgment under New York Criminal Procedure Law § 440.10 on the grounds of ineffective assistance of trial counsel.  The Onondaga County Court denied the motion on the grounds that sufficient facts appeared on the record to permit adequate review on appeal.  The Appellate Division, Fourth Department, finding that there was no question of law or

fact to be reviewed by that Court, summarily denied leave to appeal in an unpublished decision on September 21, 2004.[1]

On April 14, 2006, Stokes, appearing *pro se*, filed a motion for a writ of error *coram nobis* in the Appellate Division, Fourth Department, which was summarily denied without opinion or citation to authority on June 9, 2006; the New York Court of Appeals denied leave to appeal July 31, 2006. *People v. Stokes*, 816 N.Y.S.2d 398 (N.Y. App. Div.), *lv. denied*, 854 N.E.2d 1289 (N.Y. 2006).

Stokes timely filed his petition for relief in this Court on July 9, 2006 (date stamped August 25, 2006).

## II.  GROUNDS RAISED/DEFENSES

In his petition Stokes raises three grounds: (1) ineffective assistance of trial counsel in failing to object to his cross-examination by the prosecutor concerning a knife introduced at trial; (2) ineffective assistance of appellate counsel for failure to raise the issue of ineffective assistance of trial counsel asserted in his first ground; and (3) ineffective assistance of appellate counsel in failing to present a meritorious argument of judicial misconduct.  Respondent contends that Stokes' first ground is unexhausted and procedurally defaulted, and that he has failed to exhaust his state court remedies as to the second and third grounds.

## III.  STANDARD OF REVIEW

Because Stokes filed his petition after April 24, 1996, it is governed by the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Consequently, this Court cannot grant relief unless the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" at the time the state court renders its decision or "was based on an unreasonable determination of the facts in light of the evidence

---

[1] The record also shows that on October 14, 2004, the Onondaga County Court granted reconsideration of the § 440.10 motion, again denying it on the same procedural grounds and, alternatively, denying it on the merits.  There is no indication in the record that Stokes sought leave to appeal the October 2004 decision.

presented in the State court proceeding."[2]  The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision.[3]  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[4]  When a claim falls under the "unreasonable application" prong, a state court's application of the Supreme Court precedent must be "objectively unreasonable," "not just incorrect."[5]  The Supreme Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing the state court determination was incorrect.[6]  Finally, in a federal habeas proceeding, the standard under which this Court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[7]

In applying this standard, this Court reviews the last reasoned decision by the state court.[8]  In addition, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.[9]  If a federal claim has not been adjudicated on the merits, AEDPA deference is not required.[10]  In that situation, conclusions of

---

[2] 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405–406 (2000); *see Lockyer v. Andrade,* 538 U.S. 63, 70-73 (2003) (explaining this standard).

[3] *Williams v. Taylor*, 529 U.S. at 412.

[4] *Carey v. Musladin*, 549 U.S. 70, 77 (alterations by the Court); *see Wright v. Van Patten*, 128 S. Ct. 743, 746-47 (2008) (per curiam).

[5] *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003).

[6] *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1939 (2007).

[7] *Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321, 2328 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

[8] *Jones v. Stinson,* 229 F.3d 112, 118 (2d Cir. 2000).

[9] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[10] *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir. 2003).

law and mixed questions of fact and conclusions of law are reviewed *de novo*.[11]  A state court decision is conclusively presumed to have been on the merits when the state court disposes of the claim on other than procedural grounds, even where it fails to provide any reasoning for the disposition.[12]  Where there is no reasoned decision of the state court addressing the ground or grounds raised by Stokes on the merits and no independent state grounds exist for not addressing those grounds, this Court must decide the issues *de novo* on the record before it.[13]

## IV.  DISCUSSION

The facts of the crime are well known to the parties and, in the interest of brevity, are repeated here only to the extent necessary to understanding this decision.  Stokes was informed by his daughter (Rachel Howe) that she had been assaulted by "some dude" who had hit her in the face with a beer can.  Stokes sought out the perpetrator.  After finding the alleged perpetrator, during the ensuing struggle Stokes stabbed him with a knife.  The alleged perpetrator dies as a result of the wounds.

A.  *Exhaustion*.

In his first ground, Stokes argues that trial counsel was ineffective for failing to act upon *Sandoval*[14] and *Ventimiglia*[15] violations, when the prosecutor cross-examined him concerning the knife used in the crime.  As Respondent notes, Stokes did not present this as a factual basis for his ineffective assistance of trial counsel in either his CPL § 440.10 motion or on direct appeal. "A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the

---

[11] *DeBerry v. Portuondo*, 403 F.3d 57, 67 (2d Cir. 2005).

[12] *See Jimenez v. Walker*, 458 F.3d 130, 145–46 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 976 (2007) (Mem).

[13] *See Spears v. Greiner*, 459 F.3d 200, 203-04 (2d Cir. 2006).

[14] *People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974).  A procedure under New York law requiring notification of all specific instances of a defendant's prior uncharged criminal, vicious or immoral conduct of which the prosecutor has knowledge and which the prosecutor intends to use at trial for purposes of impeaching the credibility of the defendant.  *See also* N.Y. Crim. Proc. Law § 240.43.

[15] *People v. Ventimiglia*, 420 N.E.2d 59 (N.Y. 1981).  A procedure under New York law whereby the prosecution is required to obtain an advance ruling out of the presence of the jury on the admissibility of other crimes sought to be introduced as part of the prosecution's direct case.  *See People v. Mathews*, 497 N.E.2d 287, 289 (1986).

MEMORANDUM DECISION
*Stokes v. Graham*, 9:06-cv-01026-JKS

essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."[16]  Consequently, because Stokes did not present this as a factual basis for his claim, he did not exhaust his state court remedies.  Respondent also argues that Stokes is procedurally defaulted as to this claim as he has had his one permitted direct appeal and may not raise the issue before the state courts.  The Court agrees.[17]

Respondent argues that although Stokes raised his second and third grounds in his motion for a writ of error *coram nobis* before the Appellate Division, he did not raise them in his application for leave to appeal to the New York Court of Appeals.  The Court, having reviewed the application, concludes that, although Stokes used somewhat different language in presenting his arguments in his application for leave to appeal than he did in this motion to the Appellate Division, the fair import of his application to the Court of Appeals was that it requested further review of the issues raised before the Appellate Division and that the Court of Appeals would have so construed it.[18]  Accordingly, Stokes' second and third grounds were properly exhausted.

B.  *Merits*.

Because there is no reasoned decision by a state court addressing the grounds raised in the petition before this Court, it must address those grounds *de novo* on the record before it to determine if the decision of the Appellate Division was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[19]

Under *Strickland v. Washington*, to demonstrate ineffective assistance of counsel, Stokes must show both that his counsels' performance was deficient and that the deficient performance

---

[16] *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005) (citations omitted).

[17] *See Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001).

[18] *See Galdamez v. Keane*, 394 F.3d 68, 75–76 (2d Cir. 2005); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (warning against interpreting § 2254(c) too narrowly holding that it "requires only that state prisoners give state courts a *fair* opportunity to act on their claims.") (emphasis in original).

[19] *See Spears v. Greiner, supra*.

prejudiced his defense.[20]  A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[21]  Stokes must show that trial and appellate counsels' representations were not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsels' ineffectiveness, the result would have been different.[22]  *Strickland* and its progeny do not mandate this court act as a "Monday morning quarterback" in reviewing tactical decisions.  Indeed, the Supreme Court admonished in *Strickland*:[23]

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

The failure of appellate counsel to raise meritless or weak issues does not constitute ineffective assistance of counsel.[24]  "However, a petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."[25]

---

[20] *Strickland v. Washington,* 466 U.S. 668, 687 (1984).

[21] *Id.*

[22] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[23] 466 U.S. at 689 (internal citations and quotation marks omitted).

[24] *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983) (holding that appellate counsel does not have an obligation to raise every nonfrivolous argument); *Aparicio v. Artuz*, 269 F.3d at 99 (holding that its not ineffective counsel to fail to raise meritless claims).

[25] *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (quoting *Mayo v. Henderson*, 13 F.3d 528,

(continued...)

1.  <u>Ineffective Assistance of Trial Counsel</u>.

As noted above, this ground is unexhausted.  The Court need not rely on the failure to exhaust as it may deny the petition on the merits notwithstanding the lack of exhaustion of state court remedies.[26]  Discussion of this ground is also a necessary prerequisite to the second ground; *i.e.*, if trial counsel was not ineffective it follows, *a fortiori*, that appellate counsel could not have been ineffective in failing to raise the issue.

The testimony in question, which was elicited by the prosecution on cross-examination, is set forth in Appendix 1.  As Respondent correctly points out, the fundamental flaw in Stokes' position is that the testimony does not fall within the ambit of either *Sandoval* or *Ventimiglia*. The testimony in question went to the identification of the murder weapon and that it belonged to Stokes.  Stokes cites no New York authority that identification of the murder weapon as belonging to the defendant falls within the scope of *Sandoval* or *Ventimiglia*.  Contrary to the characterization sought to be imposed by Stokes, it does not involve any prior uncharged criminal, vicious or immoral conduct intended to impeach Stokes' credibility (*Sandoval*), nor can it be characterized as evidence of other crimes introduced as part of the prosecution's direct case (*Ventimiglia*).

Stokes has failed to establish that trial counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  In particular, Stokes has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

Stokes is not entitled to relief under his first ground.

---

[25](...continued)
533 (2d Cir. 1994)).

[26] 28 U.S.C. § 2254(b)(2).

    2.  <u>Ineffective Appellate Counsel (Failure to Raise Issue of Ineffective Trial Counsel)</u>.

Because trial counsel was not ineffective for failing to raise the issue of a groundless *Sandoval* and/or *Ventimiglia* violation, appellate counsel was not ineffective for failing to raise the issue on appeal.

Stokes is not entitled to relief on his second ground.

    3.  <u>Ineffective Appellate Counsel (Failure to Argue Judicial Misconduct)</u>.

Stokes claims that appellate counsel should have argued that the trial judge was biased, showed nepotism and injudicious decisions in refusing two mistrial requests, not allowing full questioning by defense counsel, and yelled at counsel that the victim hit Stokes' daughter, Stokes went after the victim and that was all of it.

In this case, appellate counsel argued quite vigorously the issue that denial of the motions for mistrial based upon prosecutorial misconduct constituted reversible error. The Appellate Division rejected those arguments, holding: "We reject the contention of defendant that he was denied a fair trial based on prosecutorial misconduct. It cannot be said that the prosecutor's conduct caused such substantial prejudice to the defendant that he [was] denied due process of law"[27] Thus, on this point, Stokes has failed to provide a factual basis supporting his claim.

Stokes's second and third points deal with evidentiary rulings made during the course of the trial regarding the direct testimony of Rachael Howe, Stokes's daughter.[28] The two evidentiary rulings are set forth in Appendix 2.[29] In *Liteky v. United States*, the United States Supreme Court held that judicial rulings and the opinions formed by judges on the basis of facts introduced in the course of proceedings "almost never constitute a valid basis for a bias or partiality motion . . . unless they display a deep-seated favoritism or antagonism that would make

---

[27] 796 N.Y.S.2d at 833 (internal quotation marks and citations omitted).

[28] Stokes's position, as set forth in his petition to this Court is terse and undeveloped. To more fully ascertain his position and its basis, the Court has looked to Stokes's motion for a writ of error *coram nobis* filed in the Appellate Division, Fourth Department.

[29] The evidentiary rulings Stokes referred to in his motion for a writ of error *coram nobis* before the Appellate Division.

MEMORANDUM DECISION
*Stokes v. Graham*, 9:06-cv-01026-JKS

fair judgment impossible."[30]   Contrary to Stokes's assertions, these evidentiary rulings, made outside the hearing of the jury in the course of the trial, do not have the indicia of bias on the part of the trial judge.   Indeed, they fall squarely within the scope of *Liteky*.   Stokes's arguments that the trial judge was injudicious and biased are without merit.   Consequently, the failure of appellate counsel to raise them on appeal does not constitute ineffective assistance of appellate counsel.

This Court cannot say that the decision of the Appellate Division denying the motion for a writ of error *coram nobis* was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[31]   Nor can this Court find that the state court unreasonably applied the correct legal principle to the facts of Stokes's case within the scope of *Lockyer–Williams*; *i.e.*, the state court decision was more than incorrect or erroneous, its application of clearly established law was objectively unreasonable.   Stokes has failed to establish that appellate counsel committed any error that was so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment or that Stokes's defense was prejudiced, as required by *Strickland-Hill*.   In particular, Stokes has failed to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.

Stokes is not entitled to relief on his third ground.

## V.  CONCLUSION AND ORDER

Stokes is not entitled to relief on any ground raised in his petition.

**IT IS THEREFORE ORDERED THAT** the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.[32]   To the extent the issues raised in the petition were addressed by the Appellate

---

[30] 510 U.S. 540, 555 (1994).

[31] 28 U.S.C. § 2254(d).

[32] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) ("reasonable jurists could
(continued...)

Division, Fourth Department, no reasonable jurist could find that the decision was "objectively unreasonable."  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); Second Circuit R. 22.

The Clerk of the Court to enter final judgment accordingly.

Dated:  January 28, 2009.

s/ James K. Singleton, Jr.

JAMES K. SINGLETON, JR.
United States District Judge

---

[32](...continued)
debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further") (internal quotation marks omitted).

APPENDIX 1

Q        The knife that you had when this incident happened, the one that you stabbed William Smith with --

A        Mm-hmm.

Q        (Continuing) -- okay, how long had you had that knife?

A        About seven, eight years.

Q        Okay. And that was your work knife?

A        Yes, I did use it for a work knife.

Q        When Mr. Carey -- you called it a work weapon?

A        That's what I use it for.

Q        As a weapon at work?

A        As a knife

Q        Okay.

A        (Continuing) -- at work.  And you're trying to get me mixed up.

Q        No, I'm just asking you about what you said.

A        You're trying to get me mixed up.

Q        No, I'm not, Mr. Stokes.  Mr. Stokes, is that the only knife you owned?

A        No.

Q        You own other knives?

A        Yeah, I got kitchen knives.

Q        Okay.  Well, after you threw that knife out the window, did you replace your work knife with anything?

A        Did I replace it with anything?

Q        Yeah, you went to work.

A        There's another work knife.

A.       Yes.

Q        Where -- what does that knife look like?

A        It's a little knife, about this big.

Q        Okay. What color?

A       with no handle on it.

Q       What color is it?

A       Silver.

Q.      And you used that at work, too?

A.      Yes.

Q.      Where did you keep that knife?

A.      Urn, I didn't have no, urn, sheath for that one.

Q.      Pardon?

A.      I didn't have no sheath for that one, so it's tied in my work belt.

Q       You kept that in your work belt?

A       Yes.

Q       Did you have that on you in Ithaca?

A.      Yes.

Q       Okay. This is a work knife -- this was a knife you used for work?

A       (No verbal response.)

Q       Mr. Stokes, are you going to answer?

A.      If you show it to me, I can.

Q       I'm asking you about it, though, first. Is this a knife that you used on the job?

A       I will, if you show it to me.

Q       Mr. Stokes, the knife that you had that day, was it a knife that you used on the job?

A       No.

Q       It was not a knife you took on the job?

A       I didn't use it on the job that day because I didn't need it on the job that day.

Q       Why didn't you take it to work that day?

A       Because I -- to cut rugs and cut Sheetrock.  And like I said, I didn't need to use the razor because they too dull.

Q       Okay. But you took this knife that day as a work knife?

A       As a rug cutter.

MR. CAREY: Judge, I object.  He's holding something in his hands.  It hasn't been marked.  He's just pointing out this is the knife.

THE COURT:  Why don't you mark it, Mike.

MR. SPANO: I haven't.

MR. CAREY: We should probably have it marked.

THE COURT:  Why don't you have it marked, and then you can ask questions about it.

(Whereupon, People's Exhibit Number 20 was so marked for identification by the Court Reporter.)

BY MR. SPANO:

Q      Mr. Stokes, I'm going to hand you what's been marked as People's Exhibit 20. Why don't you take a look at it and tell me if you recognize it.

A      Mrn-hrnrn.

Q      Is that the knife you had in your vest pocket when the police arrested you?

A      That's the one that they took out of my work belt.

Q      They took it out of your work belt?

A.      Yes.

MR. SPANO: Judge, I'll show this to Defense Counsel, and I'd offer it.

MR. CAREY: May I voir dire the witness, Judge?

THE COURT: Sure.

VOIR DIRE EXAMINATION

BY MR. CAREY:

Q      Mr. Stokes, the prosecutor is showing you Exhibit 20.  Have you seen that exhibit before, sir?

A      No. No, sir.

Q      I mean, have you seen the knife before, not this exhibit?

A      Urn, yes.

Q      Okay. And how long have you had that exhibit -- that knife?

A      That knife there?

Q      Mm-hmm.

A       About maybe fifteen, twenty years.

Q.      Okay. And where did you carry that knife?

A       That one sticks in the work belt around the screwdrivers and, um, pliers.

Q       Okay. Do you ever have that in your jacket?

A       No, that came out my work belt.

Q.      Okay.

        MR. CAREY: No further questions.  Thank you.

        THE COURT: All right. I'll receive it.

MR. SPANO:  Thank you, Judge.

APPENDIX 2

**[Excerpt Trial Transcript Pages 787 – 797]**

A       Um, they were doing drugs and bourbon.  And Steve and Chills were arguing, and Chills had pulled out a knife at Steve there.

Q       And you say Chills, who is William Smith, do anything to Steve at that point?

A       Yeah, they had made a drug deal.

        MR. SPANO:  Objection, Judge.

        MR. CAREY: Judge–

        MR. SPANO: Objection

        MR. CAREY: These are observations.

        MR. SPANO: Can I finish my objection?  It is irrelevant, Judge.

        THE COURT:  We talked about this at the Bench. I'm going to sustain it.

        MR. SPANO: Yeah, and he knows it's irrelevant, too.

        MR. CAREY: Judge, may I approach?

        THE COURT:  Approach.

        (Whereupon, an off-the-record discussion ensued between the Court and Counsel at the Bench.)

        THE COURT:  Patti, you better come up here for a second.

        (Whereupon, the following on-the-record discussion then ensued between the Court and Counsel at the Bench, outside the hearing of the jurors.)

        THE COURT: All right.  Now, I've sustained the objection.  You want to make a motion as to why it is relevant?

        MR. CAREY: Judge, at first, I just want to make the record clear that, you know, Mr. Spano's behavior during this entire trial has been sarcastic and insolent to this jury, that I'm distorting the truth and -- and that I'm doing some sort of misconduct.  His behavior is egregious and is prosecutorial misconduct.  And if it continues in this manner, there is certainly no way my client is going to get a fair trial.  I just wanted to make that clear on the record.

        THE COURT: Now this --

        MR. CAREY: This lady, as far as why I believe this is relevant, because it shows conduct by the parties that were involved on that same particular day.

Now, there is behavior alleged that William Smith used a weapon to attack the defendant in this case. Now, she's already testified that Chills, William Smith, used a knife in a drug transaction with someone on that same day. I certainly believe, Judge, that is relevant conduct that should be coming out. This jury should be apprised of that conduct.

THE COURT: Do you want to be heard?

MR. SPANO: Judge -- yeah, Judge, as far as the prosecutorial misconduct, I don't know what he's talking about. I haven't done anything in this trial except keep him from doing things improperly, that he's been told not to do. We talked about that at the Bench before we -- before he called this witness. And I thought it was agreed on, that that stuff would be irrelevant.

THE COURT: Well, no. We did discuss it at the Bench before the witness got on. You indicated to me you anticipated this testimony was -- there was going to be testimony coming about the victim's reputation as a drug dealer, that you didn't believe that was relevant.

Mr. Carey declined to confirm or deny whether that's what was coming, and I indicated I would rule on the questions as they were asked.

Now, in terms of the colloquy that has been going on out there in the last twenty-four hours, we are into the fourth day of this trial, and I don't think that there was any acrimony between you two in front of the jury until yesterday. I -- I just attributed that to the normal heat of the battle that occurs during trial. But I've got to tell you there's way too much going on out there. I think you both run the risk of turning this jury off by doing it. And I'm just indicating to you that I don't think it is an appropriate thing to be doing out there.

Now, as far as this particular line of testimony goes, I will tell you that I don't think that it's relevant because, Number 1, there's no indication that the defendant knew of this incident with respect to what occurred earlier during the day.

MR. CAREY: Judge, I'm trying to set a foundation for that.

MR. SPANO: But he's got to do it through his client, Judge.

THE COURT: Yeah, you can't do -- you can't lay a foundation by eliciting the conduct first and then he's now attributing it to it. I think the only one that can establish a foundation for what he knows about the victim in this case is the defendant. And I would tell you that I think that the law is pretty clear that specific acts of conduct with respect to their relevance on the issue of the victim's reputation in so far as this defendant knew it, the law is just that it's not relevant, but he's what you've got to establish with respect to him is what he knew about

the victim's reputation for violence in the community; not by -- not by establishing specific acts of it so . . .

MR. CAREY: Judge, I am not asking her questions regarding the victim's reputation.  I'm asking her to describe to this jury observations that she personally made on the very day of this incident.

THE COURT:  But it's not relevant or admissible unless he knows about it.  He'd have to know about it first.  We'd have to have a foundation that he knew about it first.

MR. CAREY: Judge, if you preclude me from asking these type of questions, it doesn't allow me to build up to the scenario where she becomes a victim at the hands of Michael Smith.

THE COURT:  You're talking about an incident between she and -- she and the victim in this case.  That's almost five to six hours later.

MR. CAREY: Exactly.

THE COURT:  There's nothing I've heard in the testimony so far that indicates that he knew about that.

MR. CAREY: Well -- well, because I haven't called him yet.  But there is continuous -- she is my first witness.  There's continuous patterned behavior by William Smith that starts immediately at 5:30.  It continues all the way up until the incident.

THE COURT:  Look it, if she wants to testify about his conduct Smith's conduct toward her, that's one thing. But Smith's conduct with respect to other people that day, I just don't think that it's relevant.  I really don't.

And, you know, so on that, insofar as that goes, I'm going to sustain the objection. Insofar as the interaction with Smith, in terms of what took place in the vehicle and so on, the prelude to his -- his seeking Smith out, that's another matter.  But in terms of what he did six hours before in an apartment in Lodi Street with someone else, I don't think that's relevant.  And I'm not going to allow it.

MR. CAREY: Judge, I'd just lodge an objection for the record. I think that it's inappropriate that you would preclude me from this type of information from the witness. This lady was a victim.  It precipitated this whole incident.  The course of conduct of William Smith started at 5:30, where he is at that party and continues all the way up to 11:30, where he hits her in the face with a beer can. And I think it's only appropriate that the jury be allowed to hear the behavior that precipitated the incidents of the defendant.

THE COURT:  Yes, what occurred between she and Smith, that's one thing, insofar as that sets the stage what occurs between -between the defendant and smith. But as to what Smith did with --

MR. CAREY:  Will you allow me to ask her what observations --

THE COURT: Not with respect to what he did with other people. Not with respect to what he did with other people.  I just don't think -- I don't think it's relevant. I think it's beyond what would normally be allowable.

MR. CAREY: If she saw this guy, hours before, pull a weapon out on somebody?

THE COURT: No. I mean, we have gone over this again and again and again. You know, I don't think that it's relevant.  I've made I've made the ruling.

MR. SPANO:  Judge, Mr. Carey -- he's going to ask her about drug dealings, too, now.

MR. CAREY: Judge--

THE COURT:  He's going to what?

MR. SPANO:  He's going to ask her about drug dealings, which is completely irrelevant.

MR. CAREY: Judge –

THE COURT:  Yeah, I don't think the issue of drug dealing is relevant.

MR. CAREY: Judge, there's cocaine found right on the blood trial.  These people should know where this guy is out at 11:30 at night, especially when there is clear evidence that that cocaine is his.

THE COURT: You know, the incident, as I understand, is he hits her in the face with a beer can, within a short time before he seeks him out. That's what I think.

MR. CAREY: Judge--

THE COURT:  I mean the whole --

MR. CAREY: There's much more to that.  There's much more than what you read in the police report, Judge.  And the time to get the truth out is at trial.

THE COURT:  I just don't think I don't see where the issue of drug dealing is relevant at all on this. I mean, I really don't.

MR. CAREY: Well, drug -- without drug dealing, can she just at least describe what she sees hours before?

THE COURT:  Why?  What is the relevance of that?

MR. CAREY: Because it shows the type of conduct that led to --

THE COURT:  What's the conduct?

MR. CAREY: Aggressive.

THE COURT:  He isn't there, your client, as I understand.

MR. CAREY: We don't know that, Judge.

THE COURT:  Your client did not go after him -- I haven't heard anything that indicates your client went after him because he was a drug dealer.  He went after him because he hit daughter in the face with a beer can.

MR. CAREY: There's other things, Judge.

THE COURT: I don't think it's relevant.  I don't want you to get into it.

MR. SPANO:  Thank you, Judge.

MR. CAREY:  Thank you, Judge.

(Whereupon, the proceedings resumed in open court.)

## [Excerpt Trial Transcript Pages 818 – 821]

Q      Did the police officer ask you about what you saw at this -- at the car when Chills pulled out that gun?

A      Yes.

Q      All right. And what did you tell them?

             MR. SPANO:  Objection, Judge.

A      I --

             THE COURT:  Yeah, I'll sustain it.

A.      I asked him --

             THE COURT:  All right. You don't have to answer that.

A      Oh, okay.

Q      Did you have a conversation with the police officer about the gun?

A      Yes, I did.

             MR. SPANO:  Objection.

             THE COURT: That's sustained.

BY MR. CAREY:

Q      In your report, all right, did you ever mention anything about the gun?

MR. SPANO:  Objection.

A.      No, I didn't.  He told me it wasn't important.

THE COURT:  Objection sustained.

BY MR. CAREY:

Q      Rachel, I'm going to show you --

MR. SPANO:  Judge, can we approach?

THE COURT:  Yeah, come on up, Patti.

(Whereupon, the following on-the-record discussion then ensued between the court and Counsel at the Bench, outside the hearing of the jurors.)

MR. SPANO:  That's why I'm objecting. This is why I have to object the way I do with him because he just keeps going.  You keep sustaining it, and he just keeps doing it.

MR. CAREY:  Judge, why am I not allowed --

MR. SPANO:  Because it's sustained that's why.

MR. CAREY:  I'm sorry. I didn't mean to interrupt, Mike.  Go ahead.

MR. SPANO:  I'm done now.

MR. CAREY:  Why am I, Judge, not allowed to ask her what she told the police officer?  She's on the stand.  She can be cross-examined.  This is proper direct examination what she told the police officer.  Because I know what Mike is going to do if I don't bring it out, why there was a problem.  That's not fair.

MR. SPANO:  That's redirect.

THE COURT:  I didn't hear you. What did you say?

MR. SPANO:  It is for redirect.

THE COURT:  Yeah, I think it is.

MR. CAREY:  No, it's not.

MR. SPANO:  Thank you.

THE COURT:  I'm going to sustain it.

MR. SPANO:  Thank you, Judge.

MR. CAREY:  Judge, can I just note my objection for the record.

THE COURT:  Yeah.

MR. CAREY:  I really think, with all due respect for the Court, I'm really kind of handcuffed, for what I really think is just proper direct questions, what she said to the police officer.

THE COURT: No, I'll sustain it.

(Whereupon, the proceedings resumed in open court.)